IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NANCY JONES,
EXECUTRIX OF THE ESTATE OF GOMER JONES,

Plaintiff,

vs.                                    Case No. 08-1011-JTM

LYNN COLE,

Defendant.

LYNN COLE,

Counter-Claim Plaintiff,

vs.

NANCY JONES,
EXECUTRIX OF THE ESTATE OF GOMER JONES,

and

NANCY JONES, Individually

Counter-Claim Defendants

MEMORANDUM AND ORDER

This is a contest over the ownership of a Kansas corporation, Product Development Group

Inc. (PDG). In 1984, Gomer Jones, the president and owner of PDG, agreed to sell 52% of the stock

in PDG to defendant Lynn Cole. The plaintiff, Nancy Jones, is a former treasurer of the company and

executor of the estate of her father, Gomer Jones. The defendant, Lynn Cole later served as president

of PDG. Plaintiff Nancy Jones argues that the stock that was the subject of the sale was never effectively transferred and remains the property of the estate. By counterclaim, Cole seeks a declaratory judgment that the stock is his, and seeks a judgment against Nancy Jones for breach of fiduciary duty. Both parties have moved for summary judgment. For the reasons stated herein, the Court denies both motions.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Gomer Jones was the president of PDG until 1985, and from 1992 until his death in September 1993. Lynn Cole was the president of PDG from 1985 to 1992, and again became president after Gomer Jones's death. Plaintiff Nancy Jones, the daughter of Gomer Jones, served as the secretary and treasurer of PDG at various times until 1995. From about 1997 to 2001 PDG did not operate and its corporate charter was canceled by the State of Kansas. The last income tax returns filed by PDG were for the 1991 tax year.

On June 25, 1984, Gomer Jones agreed to sell 52% of PDG's stock (272,340 shares). The same day Gomer Jones signed a Waiver, in which he waived all of his rights under PDG's Bylaws to the purchase of the PDG stock by Cole.  He also signed a Bill of Sale, which described the above sale of stock to Cole, free from all encumbrances, but subject to claims in litigation with Rose Hill State Bank, stating that he would warrant and defend the same against the lawful claims and demands of all persons.

Prior to this date, PDG stock certificates No. 6 and No. 8, which represented all of the outstanding PDG stock, had been seized by Rose Hill Bank as security for a loan to PDG.

At a PDG shareholder meeting held on November 12, 1984, Gomer Jones represented that Cole owned 52% of the stock.  Cole was present at the meeting, and both he and Gomer Jones signed the minutes of the meeting.

On November 13, 1985, Nancy Jones, as Treasurer of PDG, swore under oath that the information contained in a Kansas Domestic Corporation Annual Report for PDG for the year ending on April 30, 1985, was correct in listing Lynn Cole as owning 272,340 shares of the corporation and Gomer Jones owning 251,390 shares of the corporation.

By letter dated June 12, 1987, Gomer Jones notified the Sedgwick State Bank that the stockholders of record of PDG were Lynn Cole with 52% and Gomer Jones with 48%.

On September 14, 1989, John D. Philbrick, CPA, issued his Report of Certified Public Accountant concerning the financial statements of PDG for the year ending April 30, 1988, in which he reported that the Internal Revenue Service accepted an offer to settle the IRS debt of PDG, and that PDG had "paid $40,000.00 to the IRS on behalf of Gomer Jones as settlement of his personal liability incurred as a responsible officer of PDG."

After the bankrupt estate had been fully administered,  on April 20, 1993, U. S. Bankruptcy Judge John K. Pearson signed an Order for Final Decree in the PDG bankruptcy reorganization case.

By certified letter dated June 25, 1993, Rose Hill State Bank sent to Gomer Jones PDG stock certificates numbered 6 and 8, and the "paid in full note" for PDG. Three days later, Nancy Jones in her individual capacity signed the Receipt for Certified Mail from Rose Hill State Bank. When the Rose Hill loan was fully paid in the Spring of 1993, Cole asked the bank for the return of his stock certificate, and was told by the bank representative that the certificates the bank was holding had been mailed to Gomer Jones' address.

On about July 18, 1993, at Gomer Jones' request, Nancy Jones prepared Stock Certificate No. 9 stating that Lynn Cole was the owner of 272,340 shares, and Stock Certificate No. 10 stating Gomer Jones was the owner of 251,390 shares.

According to Cole, he asked Nancy Jones if she had his stock certificate, she replied that she had never seen it. Cole took her to mean that she did not have his certificate.

On July 27, 1993, Gomer Jones as President and Nancy E. Jones as Secretary of PDG signed PDG Stock Certificate No. 9 stating, "[t]his certifies that Lynn Cole is the registered holder of 272,340 shares, fully paid and non-assessable of Product Development Group, Incorporated . . . transferrable only on the books of the corporation by the holder in person or by attorney upon surrender of this certificate properly endorsed." A similar certificate, Stock Certificate No.10, signed

4

by the same officers was made out to Gomer W. Jones, reflecting his ownership of 251,390 shares of PDG stock, an amount equivalent to 48% of the total registered shares.

Cole avers that, on or about July 27, 1993, Gomer Jones personally handed PDG Stock Certificate No. 9 to him, and that he left the certificate on his desk while eating lunch with Gomer Jones, never to see the certificate again.

Gomer Jones died on September 13, 1993. Nancy Jones was appointed executor of his estate, and took control of Gomer's files and stock certificates 6, 8, 9, and 10.

In 1997, Ms. Jones took possession of PDG's corporate records and retained them until 2007 when they were transferred to Cole.  Nothing in PDG's records indicate an actual transfer of stock to Cole.  Cole has never received any PDG stock certificate issued or endorsed by Mr. Jones.

On February 3, 1999, Herbert E. Jones, son of Gomer Jones, testified under oath in Case No. 98 LM 851 in the District Court of the Thirteenth Judicial District of Kansas in Butler County, Kansas, about his father starting PDG. He testified:

> And after a time period my father bought the whole company–the interest from Willard Bashaw and his family so that he owned Product Development Group by himself. Then in about 1985, give or take one year, he had some financial problems and Lynn Cole became his partner, owning just over half of the stock.

On November 10, 2000, Nancy Jones swore under oath in a Motion to Set Aside Judgment in Case No. 00C198 filed in the District Court of the Eighteenth Judicial District in Sedgwick County, Kansas, that the Estate of Gomer W. Jones owned 48% of the shares of stock in PDG and Defendant owns 52% of the stock.

In a responsive pleading submitted on May 20, 2003, in Case No. 02C1824 in the same court, counsel for Nancy Jones wrote:

> As a part of a reorganization agreement with lenders, Lynn Cole acquired 52% of the stock in PDG. Gomer Jones died in Sept. 1993. His wife, plaintiff Catherine Jones, is the sole beneficiary under his will. His Estate and widow are plaintiffs in this action, owning the remaining 48% of stock in PDG.

5

On April 25, 2005, Cole submitted an affidavit in the same action:

> 6. After PDG had fully paid the outstanding loan at the Rose Hill State Bank that was partially secured by the stock in PDG owned by Gomer Jones and myself, I asked the bank for the return of my stock certificate. I was advised by the bank representative that the certificates for both myself and Gomer Jones had been mailed to Gomer Jones' address. I then asked Nancy Jones if she had my stock certificate, and she stated that she had never seen my stock certificate. I took her response to mean that she did not have my certificate. To this date I still do not have my original PDG stock certificate.

On April 29, 2004, in her capacity as Executor of the Estate of Gomer Jones, Nancy Jones verified under penalty of perjury that the information contained in her initial Inventory and Valuation filed in the probate case over ten years after her appointment as Executor, was true and correct in stating that among the Probate Assets owned by Gomer Jones at the time of his death was 48% of the stock in PDG.

The By-Laws of PDG provide as follows:

**Transfer of Stock**.

Section 2. Transfer of stock shall be made only on the books of the corporation and only by the person named in the certificate or by an attorney lawfully constituted in writing, and only upon surrender of the certificate therefor.

Cole did not receive any stock certificate of PDG issued to, or endorsed by, Gomer Jones.

Cole states that if he had any indication that he was not a stockholder in PDG after he signed the Agreement in June, 1984, he either would have straightened the issue out with Gomer Jones at that time, or he would have stopped devoting his life to paying off $2.8 million of PDG debt, getting the corporation out of Chapter 11, and arranging for PDG to satisfy the personal liability of Gomer Jones to the IRS in the amount of $40,000.00. He also avers that if he were not a stockholder of PDG, he would not have spent thousands of dollars defending the major asset of PDG, proprietary rights to ground support equipment for military aircraft, against the attempts of Nancy Jones, along with her mother and her brother, in Case No. 02C1824 to claim that her father, Gomer Jones, individually owned those proprietary rights.

6

Largely through her affidavit and that of her sister, Cathy Parsons, plaintiff Nancy Jones presents a different understanding of the events surrounding PDG, both in general and in particular reference to the events of July 27, 1993.

Lynn Cole formed Aero Standard Tooling, Inc. (AST) in June of 1986, and began transferring work on PDG contracts to AST. PDG employees were also transferred to AST so that by July of 1987, PDG had no employees and performed no manufacturing. AST was performing all of the manufacturing on PDG contracts using the PDG manufacturing facility, PDG equipment and former PDG employees. According to Nancy Jones, Cole claimed he was the sole stockholder of AST, even though Gomer Jones had possession of a fully-executed AST stock certificate in his name. Cole claimed that the stock certificate was not valid because its issuance did not conform with the AST by-laws.

AST continued to do all of the manufacturing and to receive all the profit and income from PDG contract until 1994. In 1994, the IRS told Cole that AST could not have employees any longer because of failure to pay withholding taxes to the IRS.  As a result, Cole shifted the manufacturing of PDG contracts back to PDG, and the AST employees were also shifted to PDG, leaving PDG to pay AST's debts. In 1996 or 1997, PDG stopped all activity, went out of business and its corporate charter was cancelled.

In March 1997,  Cole took a good portion of the PDG equipment and tooling to Missouri and delivered such equipment and tooling to his sister's company for use by them.

Nancy Jones further avers that Gomer Jones personally designed ground support equipment for military aircraft and thus owned the designs and the proprietary rights with the U.S. government to such designs. Gomer Jones maintained possession of the original design drawings and licensed PDG to use such designs in its manufacturing.  After Gomer Jones' death, Cole claimed that he personally owned such proprietary rights. However, Cole later changed his position and in Case No. 02C1824 took the position that PDG owned these rights.

According to Nancy Jones' affidavit, some time after her father's death, Cole called her and asked if she had received his stock certificate back from the bank. She responded that she had not. After Gomer Jones' death Nancy Jones took control of his files as executor of his estate. The Stock Certificate Nos. 6, 8, 9 and 10 were in his personal file at his residence. Gomer Jones never did assign or endorse Stock Certificate No. 6 to Lynn Cole or to anyone.

Since September 1993, Nancy Jones has maintained Stock Certificates No. 6, 8, 9 and 10, and no action to transfer ownership of stock to Cole has taken place. She avers that she has not made any representations to Cole about the stock.  According to her, any prior representations she may have made about the ownership of PDG were based on assumptions based on Cole's statements. She was not aware of what stock transfers had been finalized, or whether Gomer Jones had endorsed stock over to Cole. There is nothing in the PDG corporate records or in Gomer Jones' personal records that show a transfer of PDG stock to Cole.

Sometime around July 27, 1993, late in the afternoon, Cole and his wife, Shirley Cole, came to the AST offices in Wichita, "He was mad when he came into the offices. He was saying things like 'This is my company. If you don't like it get out.'" Nancy Jones shared an office with her father, and was asked to leave the office. However, she told her sister, Cathy Parsons, to stand at the door and listen, which she did. Nancy Jones avers that she was concerned because Gomer Jones had heart attacks and she did not want him to get overly upset. Lynn and Shirley Cole were yelling and swearing at Gomer Jones. Gomer Jones said things like, "Lynn we need to get our agreements down on paper." And Cole said "We don't have any agreements. This is my company. If you don't like it, get out."  Gomer Jones said, "No agreements, Lynn? No agreements? Think about it, Lynn. Lynn, you need to honor our agreements." Cole said, "If you don't like it, take your daughters and get out." Gomer Jones left the office and said, "We are going home. I have to get some things in order before we move. Lynn has shown that he isn't going to honor our agreements." (Second Affidavit of Nancy E. Jones, para. 16)

8

Nancy Jones avers that there was no discussion between Gomer Jones and Cole about offering a stock certificate, or anything concerning a stock certificate, there was no stock certificate left on any desk in the office, and that she did not pick up a stock certificate or file it anywhere. Cole did not have a desk or files in that office. The only desks in the office at that time belonged to Gomer Jones, Nancy Jones, and a secretary. Nancy Jones avers that Cole and her father did not go to lunch or anywhere together. This was the only visit made by Cole to the AST offices when Gomer Jones was present within approximately two weeks of July 27, 1993.

In contrast, Cole avers that he always maintained a desk at the office.

According to Cathy Parsons' affidavit, she heard Gomer Jones say to Cole that it was time to put their original agreements in writing. Lynn Cole responded that they had no agreements. Lynn Cole and Shirley Cole responded to Gomer Jones requests with loud swearing, and Shirley Cole began yelling threats towards Gomer Jones. Cathy Parsons then opened the door and stood in the doorway. She heard Gomer Jones say, "No agreements? Lynn? You need to think carefully about what you are saying. You need to think about what that means." Lynn Cole repeated that there were no agreements between them. Gomer Jones said "Lynn, it is obvious now that you never intended to honor any of your agreements with me. You have shown that you can't be trusted." Shortly after this meeting with Cole, Gomer Jones began the process of starting a new company. According to Nancy Jones, he never said or indicated in anyway that he had delivered or tried to deliver any stock certificate of PDG to Cole.

The PDG by-laws provide:

Section 1.   The certificate of stock shall show the entire Capital stock of the corporation; shall show the holder's name, number of shares, and shall be signed by the president or vice president and the secretary. All stock shall be issued and transferred by the officers of the corporation and shall contain the following clause:

> "If any stockholder desires to sell his share of stock he shall first offer such share or shares for sale to the other stockholders, it being the intention hereof to give the other stockholders a preference in the purchase of such shares of stock; and any attempted sale thereof in violation of this provision shall be void. A stockholder desiring to sell his shares of stock shall file notice in writing of his intention so to do with the secretary of the corporation, stating the price and terms of

9

> sale, and unless his terms are accepted by any or all of the stockholders within thirty days thereafter they shall be deemed to have waived their privilege of purchasing said shares of stock and the owner thereof shall have the right to sell to whoever will purchase for the price and upon the terms stated in said notice so filed with the secretary of the corporation."

Cole responds that the argument described in the affidavits of Nancy Jones and Parsons is "a complete fabrication and totally untrue," and stressing the improbable recollection of "the exact words that were spoken" (Dkt. No. 26, at 4).

The court notes that the present findings of fact exclude some requested findings. First, the court excludes those requested findings of fact which were submitted for the first time in a party's Reply brief. (Dkt. No. 26). Under the D.Kan.R. 56.1, such requested findings must be included in an initial brief, so that the nonmovant has the opportunity to respond to the requested findings. Second, the Court's findings also exclude putative uncontroverted facts premised on newspaper articles or other potential hearsay statements which supposedly establish the financial condition of PDG. The court agrees with plaintiff that these statements are hearsay, and accordingly they form no part of the court's's findings of fact.

The defendant argues that the statements might be admissible under K.S.A. 60-460(m) as a business record, or as a contemporaneous statement pursuant to K.S.A. 60-460(d)(1) or (d)(3). The reliance on state law is misplaced. "The admissibility of evidence in diversity cases in federal court is generally governed by federal law." *Romine v. Parman*, 831 F.2d 944, 944 (10th Cir.1987) (citations omitted). "[T]he Federal Rules of Evidence should be applied in a diversity case in federal court to determine whether evidence is relevant or prejudicial." *Id.* at 945. State hearsay rules "are procedural under Federal Rule of Evidence 401," and they may form no part of a federal court's assessment of the admissibility of evidence. *Sims v. Great Amn. Life Ins.*, 469 F.3d 870, 889 (910th Cir. 2006).

Even if the court were to consider the federal equivalents of the cited state exceptions, Fed.R.Evid. (803)(1), (3), or (6), the evidence would not be admissible. The last exception, for regularly-conducted activities including business records, has been generally found not to support

the introduction of newspaper articles. *Ziering v. New York City Dept. of Health*, 621 F.Supp. 679 (D.C.N.Y. 1985) (holding that "counsel clearly should have known that these articles are hearsay"); *Doe v. Reddy*, No. 02-05570, 2004 WL 5512966, at *5 (N.D. Cal. March 24, 2004) ("[a] medical or business record incorporating a newspaper report of intelligent life on Mars (or on any other subject) would not be admissible for the truth of its content"); *Platovsky v. City of New York*, 275 A.D.2d 699, 713 N.Y.S.2d 359, 360 (N.Y.A.D. 2 Dept. 2000) (finding that it was improper to allow witnesses to testify "concerning the content of newspaper articles"); *Sherrill v. Plumlley's Estate*, 514 S.W.2d 286 (Tex. Civ. App. 1974) (newspaper obituary not written from personal knowledge was not a business record).

Subsection (1) applies only to statements of a *present* sense impression, "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." The subsection would not apply to a description of economic activity occurring up to a year prior to the statement. Subsection (3) is also inapplicable, as it applies only to descriptions of "the declarant's then existing state of mind, emotion, sensation, or physical condition."

The plaintiff has also challenged on hearsay grounds the admissibility of a statement by Gomer Jones in a Personal Financing Statement, stating that he owned 48% of PDG; the defendant again argues that the statement is admissible under 60-460(d)(1) or (3). Again, the Federal Rules of Evidence govern the admissibility of evidence, and the court finds that the statement is not admissible on the grounds cited.

## Conclusions of Law

Jones argues that all of PDG belongs to Gomer's estate, including the 52% of the stock which her father sold to defendant Cole. She contends that no transfer occurred, because the corporation's books fail to show any such transfer, as required by Section 2 of the company's by-laws. She notes that under K.S.A. 17-6425, a transfer of stock in a corporation is effective when the stock is endorsed

and delivered to the buyer. Here, she argues, neither endorsement nor delivery ever occurred. Further, according to Jones, Cole acquired no interest in the stock since he did not physically receive the stock under K.S.A. 84-8-304(c), and never requested that the stock be registered on the company's books under K.S.A. 84-8-401(2).

Jones also argues that Cole cannot enforce the 1984 stock transfer agreement, and that his counterclaim based on breach of the agreement, since such a claim is time-barred under K.S.A. 60-511(1), which provides a five-year statute of limitations for an action based on a written instrument, or under K.S.A. 60-513, providing a three-year statute of limitations for other actions. She argues that the statute began to run on June 24, 1984, as soon as the agreement was signed, or, at the latest, in June of 1993 when Stock Certificate No. 6 was returned by the bank to Gomer Jones. Finally, Jones argues that any claim against her is also barred by the statute of limitations, and because she owed no fiduciary duty to Cole.

In his Motion for Summary Judgment and in response to Jones' Motion, Cole argues that the stock was constructively delivered to him. He also argues that, under Kansas law, it is an evidentiary question whether or not Jones had a fiduciary duty to him to register the stock. *See Wilkinson v. Cummings*, 194 Kan. 609, 400 P.2d 729, 732 (1965). He also argues that such a duty arose in light of Section 8 of the PDG by-laws, which provided: "The treasurer shall h[a]ve the custody of the corporate funds and securities; shall keep a full and accurate account of the receipts and disbursements; shall keep the other books and records of the corporation; and, generally, shall perform such duties as may be directed by the Board of Directors." Cole argues that Nancy Jones violated her duty to keep PDG's books by failing to maintain an accurate stock-transfer record. Further, by signing PDG's Annual Report, which indicated that Cole owned 52% of the company, Nancy Jones formally attested that the report was true "to the best of my knowledge," and that Report Form explicitly warns of the criminal penalties, under K.S.A. 17-5902, where a report is materially misleading owing to a lack of "the proper and due exercise of care and diligence." Cole argues that the statute of limitations is tolled by equitable estoppel.

The Court finds that evidentiary questions remain, and that both pending motions for summary judgment should be denied.

The Court finds that Kansas law does not foreclose the possibility of constructive delivery of a security, and that a rational finder of fact could conclude that constructive delivery occurred under the facts of the case.

Plaintiff Nancy Jones correctly notes that the UCC, as adopted in Kansas, provides both a specific definition of delivery (the "voluntary transfer of possession," K.S.A. 84-8-301 (1965)), and for a variety of means by which a security may be delivered. K.S.A. 84-8-313 (1965).[1] Since construction possession is not included among the enumerated means of delivery, she argues, it should be deemed to have been excluded by Kansas law.

Such a construction, however, depends upon the assumption that the list provided in 84-8-313 was intended to be exclusive, and to narrow prior law. In fact, this does not appear to have been the intent of the Kansas legislature in adopting the U.C.C. As the Kansas Comment, 1938 to K.S.A. 84-8-313 makes clear, the list of types of delivery in § 313 "*expands upon prior law* [by] recogniz[ing] the expanded conditions under which current stock transactions are conducted." (Emphasis added).[2]

---

[1]Both parties agree that the relevant statutory provisions are those in effect prior to the 1996 revision of the Kansas U.C.C.

[2]Similarly, the Kansas version of the U.C.C. provides generally:

Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

The Kansas Comment, 1983 to this section provides:

This section is perhaps one of the most important sections in the Code. It recognizes that even the Code does not cover everything, and other principles of law and equity must supplement the Code in appropriate circumstances. The list of subject matters in this section is illustrative only; the courts are free to apply other pre-Code and non-Code principles of law.

There is some authority holding that actual delivery of a security is required under the U.C.C. *See Bankwest, N.A. v. Williams*, 347 N.W.2d 163, 164 (S.D. 1984). However, such decisions appear to be linked to state-specific U.C.C. language providing that stock delivery occurs *only* through explicitly enumerated statutory means. *See id.* (*citing* Minn.Stat. § 336.8-313). *See also United States v. Doyle*, 486 F.Supp. 1214 (D.C. Minn. 1980); *In re Bame*, 252 B.R. 148, 158 n. 9 (Minn. 2000) (noting different results in jurisdictions which "utilize a version of Article 8 that omits the word 'only'").

Kansas law includes no such restriction. Further, the law in Kansas prior to the adoption of the U.C.C. explicitly allowed for delivery by constructive possession. *See Lakeview Gardens v. State*, 221 Kan. 211, 557 P.2d 1286, 1290 (1976); *Culp v. Mulvane,* 66 Kan. 143, Syl. 2, 71 P. 273 (1903) (holding that "[n]either the formal transfer of such stock upon the stock book of the corporation, nor the issuance of certificates to the purchaser, is essential to the valid transfer thereof, as between the parties thereto, or those claiming under them"). In addition, other courts have held, in the absence of exclusivity language in the state U.C.C., that constructive delivery of stock is an effective means of transfer. *See also Kallop v. McAllister*, 678 A.2d 526 (Del. 1996); *Johnson v. Dodgen*, 451 N.W.2d 168, 174 (Iowa 1990); *Hill v. Warner, Berman & Spitz*, 197 *N.J.Super*. 152, 484 A.2d 344, 348-49 (1984); *In re Carroll*, 100 A.D.2d 337, 474 N.Y.S.2d 340, 342 (1984); *Tanner v. Robinson*, 411 So.2d 240, 242 (Fla.Ct.App. 1982).

The plaintiff argues that, even if constructive possession is a permissible means of delivery, it is not present in this case, and stresses the distinctions between this case and decisions such as *Lakeview Gardens* and *Culp*. The Court finds the argument without merit.  None of the cited decisions hold that every fact present therein was a necessary ingredient of constructive possession. Instead, the courts provided a straightforward definition of constructive possession: it is "effectuated when, without actual transfer of the goods or their symbol, the conduct of the parties is such as to be inconsistent with any supposition other than that there has been a change in the nature of the holding." *Lakeview Gardens*, 221 Kan. at 216-17.

14

The court finds that a rational finder of fact could determine that constructive delivery of the stock occurred. Here, at the time of the stock purchase agreement, immediate transfer of the stock was not possible because it was held as collateral by a bank. It was later released to Gomer Jones, who had explicitly agreed to sell the stock to Cole. Both Gomer Jones and plaintiff Nancy Jones later consistently acknowledged that the stock sale had occurred and the Cole owned 52% of the company. In reliance on the stock purchase agreement, Cole managed the company and paid personal debts owed by Gomer Jones.

Nancy Jones argues that Cole could have looked up for himself whether or not the stock transfer had been entered into PDG's books. But a rational finder of fact could also find that Cole was lulled into a false sense of security by the consistent acknowledgment by both Joneses that he did indeed own 52% of the company. Further, even if she was not a managerial officer, Nancy Jones was also the Treasurer of PDG, and as such owed a duty of honesty and fair dealing with the other officers of the company. She was also bound by the PDG by-laws to maintain the company's books. A rational finder of fact could conclude that Cole was entitled to rely on Nancy Jones to immediately notify him of any fatal flaw in his claim of ownership in the company.

Nancy Jones argues that there could be no fiduciary duty since there was no inequality of power with respect to knowing whether the stock had been registered in the company books, since he was the company President and could have asked to see them. However, a rational finder of fact could find that there was an inequality between herself and Cole, not with respect to the ostensible level of power within the company, but as to the knowledge of whether the stock had not been registered, and whether after many years she would attempt to claim that he in fact owned nothing in the company.

Further, a rational finder of fact could also decide that any flaws in the endorsement or registration of the stock was waived by Gomer Jones, and thus by his estate. The stock purchase agreement provided: "I, the undersigned sole stockholder of Product Development Group, Inc. hereby waive all rights under the by-laws of said corporation to the purchase of 272,340 shares of

15

stock by Lynn Cole from Gomer Jones." This waiver of "*all* rights" could be reasonably construed to include the requirement under Section 2 of the by-laws that stock transfers take effect only when entered onto the company's books.

Nancy Jones argues that Cole cannot invoke the doctrine of waiver, since he did not detrimentally rely on any representation, and because of an absence of equity on his part. Specifically, she argues that Cole misrepresented his qualifications in his employment application by stating that he had a high school diploma. The existence of detrimental reliance will be a fact for the finder of fact to decide.  For purposes of resolving the present motions for summary judgment, it is sufficient for the Court to conclude that such a minor flaw in the defendant's employment application, utterly unrelated to issues surrounding the stock purchase agreement entered into many years later, does not preclude, as a matter of law, the defendant from arguing waiver with respect to the stock purchase.

However, while the Court finds that a rational fact finder *could* decide that the stock was constructively delivered to Cole, and that plaintiff has waived any right to enforce the requirements of endorsement or registration, the Court does not find that the fact finder *must* so decide. That is, there remain questions of fact as to whether constructive delivery should be found to exist under all the circumstances of the case, whether the plaintiff waived enforcement of, or should be estopped from asserting, the obligations of endorsement and registration; whether plaintiff Nancy Jones violated any fiduciary duty to Cole, and whether the statute of limitations on an action against Nancy Jones should be deemed tolled by the doctrines of laches or estoppel. The Court thus cannot grant summary judgment in favor of Cole on his declaratory judgment claim or his claim of breach of fiduciary duty.

IT IS ACCORDINGLY ORDERED this 17th day of July, 2009 that the Motions for Summary Judgment of the plaintiff and the defendant are hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

16